**MOM N POPS, INC., Plaintiff,**

v.

**The CITY OF CHARLOTTE, a North Carolina Municipal Corporation; Robert Brandon, Zoning Administrator; and David Barley, Zoning Enforcement Inspector, Defendants.**

No. 3:97CV308–McK.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 22, 1997.

Miles S. Levine, Goodman, Carr, Nixon & Laughrun, Charlotte, NC, Thomas Loflin, Durham, NC, for Mom N Pops, Inc.

Robert Erwin Hagemann, Office of City Attorney, Charlotte, NC, for City of Charlotte, Robert Brandon.

Andrew S. O'Hara and Daniel G. Clodfelter, Moore and Van Allen, Charlotte, NC, for David Barley.

## ORDER

McKNIGHT, United States Magistrate Judge.

This matter comes before the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(c) upon express consent of the parties, to consider Plaintiff's motion for preliminary injunction "preventing Defendants ... from enforcing any requirement of the City Code that Plaintiff obtain a city business license or zoning approval before opening at 5920 South Boulevard, Charlotte, North Carolina, and further from enforcing any of the provisions of § 12.522 of the City's Code, until such time as the Court rules on the claim for a declaratory judgment," and

for an order "directing the Defendants to issue a business license to Plaintiff forthwith upon Plaintiff's tendering the required license fee." *Complaint* at 13 ¶¶ A, D. Oral argument was conducted on June 31, 1997. For the reasons set forth below, the undersigned concludes that Plaintiff's motion should be **denied** in its entirety. Pursuant to Rule 52(a), the court makes the following findings of fact and conclusions of law, which constitute the grounds of its action:

### General Standards Governing the Granting or Denial of a Preliminary Injunction

In its recently published affirmance of the District Court's denial of a preliminary injunction enjoining enforcement of North Carolina's Act to Require Parental or Judicial Consent for an Unemancipated Minor's Abortion, the Fourth Circuit Court of Appeals summarized the standards for granting or denying a preliminary injunction:

> "[A] preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." ... It is now axiomatic which standards should be applied in this Circuit when determining whether a party's motion for preliminary injunctive relief should be granted. The proper analysis is based on this Circuit's opinion in *Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc.,* [550 F.2d 189 (4th Cir.1977)] ... In that case, this Circuit adopted a hardship balancing test to be applied by the district courts when making such a determination.... A district court deciding whether to grant a preliminary injunction must consider the following four factors:
>
> "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
>
> (2) the likelihood of harm to the defendant if the requested relief is granted,
>
> (3) the likelihood that the plaintiff will succeed on the merits, and
>
> (4) the public interest."

*Direx Israel, Ltd. v. Breakthrough Medical Corporation, et al.,* 952 F.2d 802, 812 (4th Cir.1992) ... The plaintiff bears the burden of establishing that these factors favor granting the injunction....

Under this hardship balancing test, the first two factors regarding the likelihood of irreparable harm to the plaintiff if denied and of harm to the defendant if granted are the most important. ... Thus, the first task of the district court is to determine the harm that will be suffered by the plaintiff if no preliminary injunction is entered. The harm demonstrated by the plaintiff must be " 'neither remote nor speculative, but actual and imminent.' " ... The district court must then balance this harm against the harm which would be suffered by the defendant if the preliminary injunction is granted. ...

Once this balancing is completed, the district court can then determine the degree to which the plaintiff must demonstrate a likelihood of success on the merits. In this regard, we have stated:

> If, after balancing those two factors [i.e. irreparable harm to plaintiff against harm to the defendant], the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required.

... Thus, the balancing of hardships must be made before reaching the question of likelihood of success on the merits, because "[u]ntil that balance of harm has been made, the district judge cannot know how strong and substantial must be the plaintiff's showing of 'likelihood of success.' " ... After the district court has balanced the hardships, determined the required showing of likelihood of success on the merits and analyzed that likelihood, the district court also analyzes the final factor, the public interest. Once this analysis is completed, the district court is in the proper position to make a final determination of whether a preliminary injunction should be entered.

*Manning v. Hunt,* 119 F.3d 254, 263–64 (4th Cir.1997) (case citations omitted).

## FINDINGS OF FACT

### The Parties

1. Plaintiff, Mom N Pops, Inc., is a corporation organized and existing under the laws of the State of North Carolina.

2. Defendant City of Charlotte, North Carolina, ("Charlotte") was and is a municipal corporation existing as such under the laws of the State of North Carolina, situated in the County of Mecklenburg.

3. Defendant Robert Brandon is and was at all material times the Zoning Administrator of Charlotte, the chief city official responsible for enforcement of Charlotte's Zoning Ordinances, and the direct supervisor of Defendant Barley.

4. Defendant David Barley is and was at all material times a zoning enforcement inspector for Charlotte, and also for Mecklenburg County, whose duties include assisting Defendant Brandon in enforcing Charlotte's zoning ordinances.

### Relevant Privilege License and Zoning Statutes

5. **Privilege License.**

Charlotte's privilege license tax provisions are found in Chapter 13 of the Charlotte City Code. The privilege license tax is levied pursuant to N.C.Gen.Stat. § 160A–211 and Charlotte's Zoning Ordinance. Mecklenburg County administers the privilege license tax under an interlocal agreement. Charlotte's privilege license ordinance functions only to raise revenue, as is stated in its purpose section:

**Sec. 13–16. Purpose.**

(a) The purpose of this article is to raise funds for general municipal purposes. Therefore, it should be construed to require payment of the maximum tax permitted for the privilege of carrying on a business, trade, profession, calling or occupation within the corporate limits of the city.

(b) A license issued pursuant to this chapter reflects that the appropriate tax has been paid. Issuance of a license does not constitute regulatory approval and does not excuse a licensee from compliance with any other applicable ordinance, regulation, or statute. By issuing a license, the City of Charlotte has not determined that the recipient is in compliance with any applicable local, state or federal regulation or law or that the recipient is otherwise engaged in a legal activity or operating a business in a legal manner.

*Ordinance Amending Chapter 13 of the Charlotte City Code Entitled "Licenses"* (adopted March 24, 1997). Def. Exh. 17.

The underlying statutory authority for the privilege license tax is found in Chapter 160A of the North Carolina General Statutes:

Except as otherwise provided by law, a city shall have power to levy privilege license taxes on all trades, occupations, professions, businesses, and franchises carried on within the city.

N.C. Gen.Stat. § 160A–211.

A zoning approval must be obtained before a privilege license is issued:

Each new application or an established business moving to a new location must be approved as to zoning requirements by the city before such license shall be issued.

Charlotte City Code § 13–21(b).

6. **Zoning provisions.**

a. An amendment to the Charlotte zoning ordinance adopted by the Charlotte City Council on January 18, 1994, defined "adult establishment"; restricted "adult establishments" to B–2 (business), UMUD (Uptown Mixed Use), and I–1 and I–2 (industrial) zoning districts subject to certain restrictions; and specified the restrictions within the approved districts, including separation requirements from certain sensitive protected uses and prohibition of the location of more than one adult establishment within the same structure.

"Adult establishment" is therein defined as "[a]ny structure or use of land which meets the definition of adult establishment as outlined in North Carolina General Statute Sec. 14–202.10." N.C. Gen.Stat. § 14–202.10 is

specifically incorporated as an appendix to the Zoning Ordinance.

"Adult bookstore," "adult mini motion picture theatre", "sexually oriented devices," "specified anatomical areas," and "specified sexual activities" are defined in N.C. Gen. Stat. § 14–202.10 as follows:

(1) "Adult bookstore" means a bookstore:

a. Which receives a majority of its gross income during any calendar month from the sale of publications (including books, magazines, and other periodicals) which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to specified sexual activities or specified anatomical areas, as defined in this section; or

b. Having as a preponderance of its publications books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to specified sexual activities or specified anatomical areas, as defined in this section.

. . . .

(6) "Adult mini motion theatre" means an enclosed building with viewing booths designed to hold patrons which is used for presenting motion pictures, a preponderance of which are distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas as defined in this section, for observation by patrons therein.

. . . .

(9) "Sexually oriented devices" means without limitation any artificial or simulated specified anatomical area or other device or paraphernalia that is designed principally for specified sexual activities but shall not mean any contraceptive device.

(10) "Specified anatomical areas" means:

a. Less than completely and opaquely covered: (i) human genitals, pubic region, (ii) buttock, or (iii) female breast below a point immediately above the top of the areola; or

b. Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

(11) "Specified sexual activities" means:

a. Human genitals in a state of sexual stimulation or arousal;

b. Acts of human masturbation, sexual intercourse or sodomy; or

c. Fondling or other erotic touchings of human genitals, pubic regions, buttocks or female breasts.

N.C. Gen.Stat. § 14–202.10(1), (6), (9), (10), (11).

The zoning requirements for adult establishments are set out in this ordinance as "Section 12.518." The introduction to § 12.518 states:

Studies have shown that lowered property values and increased crime rates tend to accompany and are brought about by the concentration of adult establishments as defined herein. Regulation of these uses is necessary to insure that these effects do not contribute to the blighting of surrounding neighborhoods and to protect the integrity of the City's schools, churches, child care centers, parks and playgrounds which are typically areas in which juveniles congregate. It is the intent of this provision to establish reasonable regulations to prevent a concentration of adult establishments within the City of Charlotte and to separate adult establishments from those sensitive uses listed below.

The remainder of § 12.518 sets out the requirements for adult establishments:

Adult establishments are permitted in the B–2, UMUD, I–1, and I–2 districts subject to the following requirements:

(a) Any structure in which an adult bookstore or adult mini motion picture theatre establishment is the principal or accessory use shall be separated by a distance of at least 1500 feet from any residential district, school, church, child care center, park or playground. The Charlotte Zoning Board of Adjustment shall have no authority to grant a variance from the 1500 foot separation standard. . . .

Charlotte Zoning Ordinance § 2.201 (January 18, 1994). Def. Exh. 19.

(b) On September 18, 1995, the Charlotte City Council adopted "temporary" defini-

tions of "adult bookstore" and "adult mini-motion picture theatre" (originally § 12.519, but changed to § 12.522 when codified because § 12.519 had already been dedicated). The "purpose" section of this ordinance states:

The Charlotte City Council and City staff are undertaking a comprehensive review of current and potential policies regarding the regulation of adult establishments. The current adult establishment provisions include spacing requirements of 1,500 feet for adult bookstores and mini-motion picture theatres and 1,000 feet for any other adult establishment from schools, playgrounds, child care centers, places of worship and residentially zoned districts. Some owners and operators of adult establishments have devised methods that attempt to circumvent the adult establishment provisions in order to locate within the areas protected by the separation requirements. The temporary definitions contained in this section are intended to prevent further attempts to circumvent the current policy of the Charlotte City Council while the comprehensive review is conducted and any revised or additional policies are developed and implemented.

The ordinance adopts the following "temporary" definition of "adult bookstore":

Notwithstanding the definitions of "Adult bookstore" contained in G.S. 14–202.10(1) and Section 2.201 of the Zoning Ordinance, "Adult bookstore" means a business establishment that:

(a) has as one of its principal business purposes the sale or rental of; or

(b) has a substantial or significant portion or its stock or trade for sale or rental:

"publications" which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to "specified anatomical areas", as defined in G.S. 14–202.10(10), or "specified sexual activities", as defined in G.S. 14–202.10(11); and/or (ii) "sexually oriented devices", as defined in G.S. 14–202.10(9).

As used in this definition, "publications" include, by way of illustration, books, magazines, other periodicals, movies, videotapes, and other products offered in photographic, electronic, magnetic, digital or other imaging medium.

In addition of all other information available to the Zoning Administrator in making a determination whether a particular use is an "Adult bookstore", any of the following shall be indicia that an establishment has as one of its principal business purposes the sale or rental of "publications" which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to "specified sexual activities" as defined in G.S. 14–202.10(10), or "specified anatomical areas", as defined in G.S. 14–202.10(11); and/or (ii) "sexually oriented devices", as defined in G.S. 14–202.10(9):

(a) restricted access to the business establishment or portions of the business establishment by persons under 16 years of age:

(b) posted signs or notices outside and/or inside the business establishment indicated that the material offered for sale or rental might be offensive;

(c) the building or portion of the building containing the business establishment does not have windows or has windows that are screened or otherwise obstructed or are situated in a manner that restricts visual access from outside the building to materials displayed within for sale or rental.

The ordinance adopts the following "temporary" definition of "adult mini motion picture theatre":

Notwithstanding the definition of "Adult mini motion picture theatre" contained in G.S. 14–202.10(6), "Adult mini motion picture theatre" means an enclosed building with one or more viewing booths or partitioned areas designed to hold patrons for the presentation and viewing of motion pictures (film, videotape, laser disc, CD–ROM or other imaging media), where:

(a) one of the principal business purposes is the presentation and viewing of

motion pictures in the viewing booths that; or

(b) a substantial or significant portion of the stock of motion pictures available for viewing or that are actually viewed in the viewing booths:

are distinguished or characterized by their emphasis on matter depicting, describing, or relating to "specified anatomical areas", as defined in G.S. 14–202.10(10), or "specified sexual activities", as defined in G.S. 14–202.10(11); and/or (ii) "sexually oriented devices", as defined in G.S. 14–202.10(9).

In addition of all other information available to the Zoning Administrator in making a determination whether a particular use is an "Adult mini motion picture theatre", any of the following shall be indicia that the business establishment has as one of its principal business purposes the presentation and viewing in viewing booths motion pictures which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to "specified sexual activities", as defined in G.S. 14–202.10(10), or "specified anatomical areas", as defined in G.S. 14–202.10(11); and/or (ii) "sexually oriented devices", as defined in G.S. 14–202.10(9):

(a) restricted access to the business establishment or portions of the business establishment where viewing booths are located by persons under 16 years of age;

(b) posted signs or notices outside and/or inside the business establishment indicated that the material offered for presentation and viewing in the viewing booths might be offensive;

(c) the portion of the building containing the viewing booths is screened or otherwise located or situated in a manner that restricts or limits complete visual access to the booths from the primary or principal clerk or cashier area.

#### 7. Zoning compliance.

Section 4.104(1) of the Charlotte Zoning Ordinance requires the Zoning Administrator to

conduct reviews and make approvals of zoning compliance under these regulations for the issuance of building permits, certificates of occupancy, sign permits and zoning use permits.

Zoning compliance approval, which must be obtained in advance, is recorded on one of three documents: Where construction work is involved, on an "Application for Building Permit"; where no construction work is involved, there is no change from prior approved use, and no conditions are triggered, by initial on a privilege license application; where the use is permitted under prescribed conditions or would amount to a change of use, by a "Zoning Use Permit." Brandon Aff. at ¶¶ 6–8.

The zoning compliance process does not accord discretion to the Zoning Administrator. Unlike in the quasi-judicial conditional or special use proceeding pursuant to N.C.Gen.Stat. § 160A–381, the Charlotte zoning administrator is not authorized to decide whether a use should be permitted or the conditions under which it would be allowed.

The enforcement process ordinarily begins with the issuance of a Notice of Violation. Since a Notice of Violation is a decision or determination of the Zoning Administrator, the party against whom it is issued has sixty days to appeal the decision to the Charlotte Zoning Board of Adjustment, pursuant to § 5.103 of the Zoning Ordinance and N.C.Gen.Stat. § 160A–388(b). Under that statutory provision, "[a]n appeal stays all proceedings in furtherance of the action appealed from [with limited exceptions]...." *Id.* If the Zoning Board of Adjustment upholds the Notice of Violation, the party against whom it was issued has the right to a *certiorari* review in North Carolina State Superior Court, pursuant to N.C.Gen.Stat. § 160A–388(e).

#### Historical Background of the Instant Litigation

8. On May 26, 1995, Defendant Barley issued South Boulevard Video & News, Inc., a Zoning Use Permit (Change of Use) authorizing the use of the property at 5920 South Boulevard for "video booths & retail sales." Its previous use was as a restaurant. In the

"remarks" section of the permit is handwritten the following statement: "Section 12.518 applies. Approval is based on the basis that the preponderance of inventory sales will be non-adult in nature." Def. Exh. 3.

9. The physical structure on the property at 5920 South Boulevard, which property is in a B–2 zoning district, is located within 1,500 feet of residentially zoned property (including the Montclair South neighborhood) and a church (Saints and Sinners of the Associate Reformed Presbyterian Church on Old Pineville Road).

10. On November 10, 1995, as a consequence of investigating a complaint, which investigation included three separate visits to the property by a zoning official, Defendant Barley issued a Notice of Violation to South Blvd. Video & News and Michael E. and Julia Todd, owners of the property, citing them for operating an "adult bookstore" and an "adult mini-motion picture theatre" in violation of the Charlotte zoning ordinance. South Blvd. Video & News appealed. On March 26, 1996, the Charlotte Zoning Board of Adjustment ("ZBA") conducted a quasi-judicial hearing, and voted unanimously to uphold the Notice of Violation.

11. South Blvd. Video & News appealed to Mecklenburg County Superior Court. On December 16, 1996, the Hon. Julia V. Jones affirmed the ZBA's ruling along with the Notice of Violation and issued a permanent injunction, concluding and ordering as follows:

> Having determined that Respondent Charlotte Zoning Board of Adjustment properly concluded that Petitioner South Blvd. Video & News, Inc. Is operating an "adult bookstore" and "adult mini-motion picture theater establishment" at 5920 South Boulevard, Charlotte, North Carolina in violation of the Charlotte Zoning Ordinance, it is necessary to provide a remedy to ensure that this violation is cured. Therefore, it is furthered [sic] ORDERED, ADJUDGED AND DECREED, upon Respondents' Motion for Permanent Injunction, that a permanent injunction is entered ordering Petitioner to cease operation of and refrain from operating its current businesses (i.e.

an "adult bookstore" and "adult mini-motion picture theater establishment") at 5920 South Boulevard, Charlotte, North Carolina. This injunction is binding on Petitioner South Blvd. Video & News, Inc., its officers, agents, servants, employees, and upon those persons in active concert or participation with them who receive actual notice in any manner of this order by personal service or otherwise, and upon others subject to injunctive orders as prescribed in Rule 65(d) of the North Carolina Rules of Civil Procedure.

12. Having learned of Judge Jones' Order, on December 16, 1996, and acting pursuant to N.C.Gen.Stat. § 160A–422, Defendant Brandon revoked South Blvd. Video & News' Zoning Use Permit "for substantial departure from the approved application and for failure to comply with the provisions of the Charlotte Zoning Ordinance which prohibit adult uses at the subject location." South Blvd. Video & News appealed this revocation to the Charlotte Zoning Board of Adjustment. On April 24, 1997, having heard the matter, the ZBA unanimously voted to affirm the revocation issued by Defendant Brandon.

13. On December 19, 1996, a zoning inspection was conducted at 5920 South Boulevard. It was determined that the property was being used without having obtained the required zoning approval, in violation of §§ 4.101(2) and 4.103 of the Charlotte Zoning Ordinance. Defendants Barley and Brandon issued a Notice of Violation to South Blvd. Video & News and to Michael E. and Julia Todd, instructing them pursuant to § 8.102(2) of the Charlotte Zoning Ordinance to cease use of the property by December 20 at 9:00 a.m., and to refrain from using the property until the necessary zoning approval is obtained.

14. Pursuant to § 8.105 of the Zoning Ordinance, Defendant Barley then began issuing daily civil penalty citations to South Blvd. Video & News. These citations ultimately totaled more than $14,000. On December 27, 1996, the City of Charlotte filed a complaint in Mecklenburg County Superior Court against South Blvd. Video & News and Michael E. and Julia Todd, asking the Court to enter judgment declaring that the Defen-

dants are using the property without necessary zoning approval, for injunctive relief prohibiting use of the property without necessary zoning approval, and for judgment requiring payment of the assessed penalties. This case is still pending in Mecklenburg County Superior Court.

15. Despite permit revocation, civil penalties, and the Superior Court injunction, South Blvd. Video & News continued to operate an "adult bookstore" and an "adult mini-motion picture theater establishment" on the premises. On December 20, 1996, Judge Jones issued an Order directing South Blvd. Video & News to appear and show cause why it should not be held in civil contempt. Judge Jones conducted a hearing on January 14 and 16, 1997, and on the basis of that hearing, by Order dated January 24, 1997, found South Blvd. Video & News in contempt. Judge Jones ordered that, to purge itself of contempt, South Blvd. Video & News must "immediately cease operation of all business activity at 5920 South Boulevard...." Judge Jones denied the motion to stay pending appeal. South Blvd. Video & News appealed.

16. Despite having subleased the property at 5920 South Boulevard to Mom N Pops on April 15, 1997, South Blvd. Video & News continues to appeal Judge Jones' Orders of December 16, 1996, and January 24, 1997. As to both Orders, the record on appeal has recently been settled.

17. South Blvd. Video & News ceased operation after Judge Jones issued the contempt order.

18. In each proceeding, South Blvd. Video & News was and is represented by the same counsel, Thomas F. Loflin, III, and Miles S. Levine, who now represent Mom N Pops.

**The Instant Litigation**

19. On March 10, 1997, Articles of Incorporation for Mom N Pops, Inc., were filed with the North Carolina Secretary of State. The listed incorporator is one Christopher M. Jones. His listed address, 123 Orange Street, Durham, North Carolina 27701, is the same address as that of Thomas F. Loflin,

III, counsel for both South Blvd. Video & News, Inc., and Mom N Pops, Inc.

20. On April 16, 1997, a sublease agreement was executed between South Blvd. Video & News, Inc., and Mom N Pops, Inc., subleasing the property occupied by South Blvd. Video & News, Inc., to Mom N Pops, Inc., and declaring that "[Mom N Pops, Inc.] shall be entitled during the term of this sublease to use the name, South Blvd. Video & News, and to the goodwill of [South Blvd. Video & News]."

21. On May 16, 1997, Charles L. Lunsford, accompanied by Miles S. Levine, one of Mom N Pops' attorneys in this matter, went to the Privilege License Division of the Mecklenburg County Tax Collector's Office to apply for the necessary business license to open a retail and video business at 5920 South Boulevard, which is within the city limits of Charlotte. ˙Lunsford, who is regularly employed as manager of Queen City Video & News, an adult bookstore operating in Charlotte, who was neither an officer, director, shareholder, or employee of Plaintiff, who had no contract for services with Plaintiff, who received no compensation from Plaintiff, who had no responsibilities for Plaintiff other than filling out the privilege tax forms, who knew nothing about the business of Mom N Pops other than what he had been told by others, who acted only at the request of his employer, George Elliott, and someone named "Dee" with whom he had only spoken by telephone, and who had never been in the premises at 5920 South Boulevard since it was subleased by Plaintiff, signed the privilege license tax form as Plaintiff's agent.

At the time application was made, Plaintiff was aware of the December, 1996, injunction and the January, 1997, contempt orders issued by Judge Jones.

At the time Plaintiff subleased the premises at 5920 South Boulevard, the building was already constructed to be a retail book and novelty store and contained a video arcade for showing rented videos in private rooms, thus making it unnecessary for Plaintiff to do any construction or building alterations whatsoever. Plaintiff was ready to open and desired to open immediately upon obtaining a

business license from the City, as it sought to do on May 16, 1997. On May 16, 1997, Plaintiff had already obtained the necessary North Carolina State business licenses.

22. At the Privilege License Division, Lunsford and Levine were given a copy of the City of Charlotte & Mecklenburg County 1996–97 Privilege License Application and directed to the Zoning Division of the Mecklenburg County Engineering & Building Standards Department for verification that their business complied with relevant zoning restrictions. All applicants for business privilege licenses are referred to the Zoning Division for this verification.

23. At the Zoning Division counter, Defendant David Barley received Mom N Pops' privilege license application. Defendant Barley was personally aware of the history of prior uses and enforcement actions at 5920 South Boulevard. Barley told the applicants he would need further information as to their application and would have to consult with Defendant Robert Brandon, his supervisor, before giving zoning approval for a business at 5920 South Boulevard. Barley did not set a date for deciding or having decided upon zoning approval or issuance of the privilege license.

24. On May 23, 1997, almost simultaneously with the filing of the instant Complaint, but without any prior knowledge that the Complaint had been filed or was contemplated, Defendant Brandon sent a letter by facsimile machine to Mr. Levine detailing the history and zoning status of 5920 South Boulevard and describing zoning regulations. Brandon outlined the method and process for application for a new business at 5920 South Boulevard and set forth the type of information needed for the Zoning Department to make an appropriate classification of the business for zoning purposes:

> Given the revocation of Zoning Use Permit U0374350, the last validly approved use of the property was for a restaurant. Since I understand that your "new" client wishes to use the property for the sale and/or rental of video tapes, magazines and novelties and "slot locks", a Zoning Use Permit (Change of Use) would be required. In order to approve a Zoning Use Permit to allow a non-adult retail store, this office must be satisfied that the proposed use is not an "adult establishment" under the current City of Charlotte Zoning Ordinance. I am enclosing a copy of Section 12.519, a section that contains the definition of "adult bookstore" and "adult mini-motion picture theater."

> As you can see from the ordinance, an "adult bookstore" is a business that "has as one of its principal business purposes the sale or rental of [adult material]" or "has a substantial or significant portion of its stock or trade for sale or rental [that is adult material]." In applying these tests, I am directed to consider whether the business restricts access to all or part of the establishment by persons under 16 years of age, whether signs are posted indicating that the material offered for sale or rental might be offensive, and whether the building has no windows or windows that are screened in a way that prevents someone outside the building from seeing merchandise displayed.

> In addition, the ordinance defines "adult mini-motion picture theater" as a business that has as "one of the principal business purposes ... the presentation and viewing of [adult] motion pictures in ... viewing booths" or has "a substantial or significant portion of the stock of motion pictures available for viewing or that are actually viewed in the viewing booths [that are adult motion pictures]." In applying these tests, I am directed to consider whether the business restricts access to all or the portions of the establishment where viewing booths are located by persons under 16 years of age, whether signs are posted indicating that the material offered for presentation and viewing in the viewing booths might be offensive, and whether the portion of the building containing viewing booths is screened or otherwise located such that the [sic] there is not complete visual access to the booths from the primary or principal clerk or cashier area.

> In order for me to make a decision on whether a proposed use is a permitted retail use or a prohibited "adult establishment," you must submit a Zoning Use

Permit Application including information sufficient to enable me to determine whether one of your client's principal business purposes is the sale or rental of adult material or whether adult material comprises a substantial or significant portion of your stock or trade, and/or whether one of your client's principal business purposes is the presentation and viewing of adult motion pictures in booths or whether adult motion pictures are a substantial or significant portion of the motion pictures available for viewing in the booths. In addition, in light of the past proceedings, I will require, at a minimum, that information should include a proposed layout of the store including the location of various types of adult and non-adult merchandise that will be offered for sale or rental, a description of the nature and quantities of the stock of adult and non-adult merchandise that will be offered for sale or rental, including a detailed initial inventory, and how that merchandise will be displayed, and information pertaining to the anticipated trade in adult and non-adult merchandise, and how, if requested, evidence of the actual breakdown of adult versus non-adult trade will be submitted in the future. Also, you must indicate whether access by minors to merchandise of portions of the business will be restricted, the nature and location of any signage warning of offensive material, and whether and how windows will be screened. Any other information that will assist me in determining whether the proposed use is an adult establishment or a general retail use should also be submitted.

Finally, I will require the following information:

1) Copy of Lease

2) Proof that South Blvd. Video & News, Inc.'s lease has been terminated or assigned

3) Certified copy of the Articles of Incorporation, corporate bylaws, and all corporate minutes

4) Names and residence addressed [sic] of Corporate Officers, Directors, and stockholders holding more than 5% stock of corporation

5) For each officer, director, or stockholder identified, statement of whether the officer, director, or stockholder was an officer, director, stockholder, employee, agent, or was otherwise involved in the management or operations of South Blvd. Video News, Inc. and the nature of such involvement

6) Federal tax identification number and completed tax information authorization form (IRS Form 8821)

7) Proof of "agent's" authority to make application, photo identification, and "agent's" residence address

8) Signed authorization of property owner(s)

25. Plaintiff has not responded to Brandon's letter nor submitted a complete Zoning Use Permit application.

26. On May 23, 1997, Plaintiff filed the instant complaint, alleging that the City of Charlotte's adult business zoning regulations are unconstitutional and seeking a preliminary injunction, permanent injunction, declaratory judgment, and monetary damages.

27. Plaintiff states that at the time it applied for a business license and at the time of the filing of the instant suit, its "policy" is "not to carry any materials which depict any human nudity of genitals or buttocks or any human nudity showing the breasts of females who have attained puberty, and also not to carry any materials depicting human sexual activity, actual or simulated, normal or perverted." *Complaint* at ¶ 10. Plaintiff states that this will change "to carrying such materials if the City's present zoning ordinances pertaining to such materials are declared unconstitutional by this Court or enjoined from being enforced." *Complaint* at ¶ 11. Upon opening, Plaintiff intends, as a policy, not to permit "access to the store" of "anyone under 18." *Complaint* at ¶ 22.

28. On June 19, 1997, pursuant to court-ordered limited discovery, Defendant Robert Brandon, accompanied by Mom N Pops counsel Miles Levine, visited and inspected the business premises at 5920 South Boulevard and reviewed the inventory of materials displayed therein. In his affidavit of June 26, 1997, Brandon states:

4. The books, magazines and periodicals openly on display in the store were all in the broad category of paperback romance and adventure books or were comic books and magazines. Many of the comic books, however, were displayed on racks which bore identifying labels suggestive of adult content or sexual character such as "bondage," "swingers," and "explicit."

5. In addition to the books and periodicals I observed in the store, there was a substantial quantity of so-called novelty items displayed for sale. Without exception, these items were all of a sexual nature, including dildoes, vibrators, lubricants, various leather accessories, simulated male and female genitalia, inflatable women and animals with simulated orifices, and various other sexual toys and stimulants. From my inspection, I estimated that approximately forty percent (40%) of the total space devoted to display of merchandise was given to these novelty items.

6. During my inspection I did not observe any sexually-oriented videotapes or audio tapes displayed either for sale or rental. There were a number of private viewing booths for viewing videotapes on premises, but these did not contain any sexually-oriented materials. All of them bore a sign stating "Sorry—temporarily out of service."

Plaintiff does not object to the accuracy of this assessment of the store's contents.

Brandon further states in his affidavit that, based upon his inspection, he "would have no difficulty and no question concluding that a principal purpose of the business at 5920 South Boulevard was the sale of sexually oriented devices and that a substantial and significant portion of such business' stock in trade consists of sexually oriented devices," such that with this knowledge he would have denied "any application for a zoning use permit or certificate of occupancy for the premises located at 5920 South Boulevard on the ground that such location does not comply with the standards of sections 12.518 and 12.522 of the Zoning Ordinance."

29. An "Acknowledgment of Corporate Indebtedness" executed by Plaintiff on April 18, 1997, records Plaintiff's purchase of two thousand videotapes, five hundred paperbacks and comics, and five thousand novelty items from South Blvd. Video & News. The Acknowledgment states that the videos and printed matter are "of a non-sexually-explicit nature," and that the "novelty items consist of sexual and non-sexual devices." The following paragraph of the Acknowledgment states:

> Buyer understands that Seller will remove before Buyer opens its own retail store on the premises all videos, films, CD–ROMs, books, magazines, and periodicals containing any adult nudity and/or explicit sexual activity, normal or perverted. Buyer understands that it is not purchasing sexually explicit videos, films, CD–ROMs, books, magazines, or other periodicals.

## CONCLUSIONS OF LAW

Plaintiff alleges loss of First Amendment freedom occasioned by the ordinances and how they are enforced, and thus, irreparable injury or the threat thereof. In this context, the *Blackwelder* questions of irreparable harm and likelihood of success on the merits are necessarily subsumed into the First Amendment inquiry. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). If First Amendment rights are being violated or in danger of being violated, Plaintiff is likely to succeed on the merits, and the balance of equities will not aid Defendants. *Gold Coast Publications, Inc. v. Corrigan,* 798 F.Supp. 1558, 1562–63 (S.D.Fla.1992); *Gannett Satellite Information Network, Inc. v. Township of Pennsauken,* 709 F.Supp. 530, 535 (D.N.J. 1989).

### Conclusions of Law as to Plaintiff's First Amendment Claims

Plaintiffs seek to advance a facial challenge to the privilege license scheme and zoning ordinance. Although Defendants do not press the issue, the undersigned must first determine whether Plaintiffs may bring a facial challenge to the Charlotte privilege

license scheme and zoning ordinance. *Chesapeake B & M, Inc. v. Harford County, Md.,* 58 F.3d 1005, 1009 (4th Cir.1995). "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988), quoted in *Chesapeake B & M,* 58 F.3d at 1009.[1] "Although facial challenges to legislation are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad." *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 223, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990). Because discretion and overbreadth are two of the contentions raised by Plaintiffs, the better approach under the authority cited seems to be to permit the facial challenge.

1. **The privilege license scheme, involving zoning review prior to issuance of a privilege license.**

 a. **The Charlotte privilege license is a revenue raising device, not a regulatory scheme.**

 ■ A "license" thus issued reflects that the appropriate tax has been paid. It does not constitute regulatory approval, and it does not excuse a licensee from compliance with any other applicable ordinance, regulation, or statute.

 > The name "privilege license" tax can be misleading because the word "license" may be taken to mean that the tax has a larger regulatory element than it does. The privilege license tax is a revenue-generating measure and should not be used to regulate otherwise legitimate businesses. ...
 > In discussing occupation taxes in his classic treatise on municipal corporations, Judge Dillon stresses the distinction between the use of the police power to regu-

late an occupation and the taxing power to extract revenue for the privilege of engaging in the occupation. ...

William A. Campbell and David M. Lawrence, *North Carolina City and County Privilege License Taxes,* "Introduction," 2–3 (1990).

■ Charlotte's practice of referring all privilege license applicants to the zoning administrator does not convert the privilege license into a regulatory license. Charlotte's zoning compliance process does not involve or permit any discretion on the part of the zoning administrator as to whether a particular use is allowed in a particular district or property therein. The zoning review has as its sole purpose to determine the kind of business. In this review, the zoning administrator has *no* discretion as to whether the business will be allowed to operate at the location, if it is the type of business for which the location is zoned.

As to regulatory discretion, Charlotte's procedure strongly contrasts with a special/conditional use scheme, as in N.C.Gen. Stat. § 160A–381, authorizing cities to provide through their zoning ordinances that "a board of adjustment or the city council may issue special use permits or conditional use permits in the classes of cases or situations and in accordance with the principles, conditions, safeguards, and procedures specified therein and may impose reasonable and appropriate conditions and safeguards upon these permits." The special/conditional use process permits uses in particular zones upon proof of certain ordinance-mandated facts and conditions in a quasi-judicial proceeding. *Coastal Ready–Mix Concrete Co., Inc. v. Board of Com'rs of Town of Nags Head,* 299 N.C. 620, 265 S.E.2d 379 (1980).

> [In seeking a special use permit] [t]he burden is on the applicant to present sufficient evidence to allow the board to make a finding that all of the required specific standards will be met. ... The board can impose additional conditions on the permit if needed to bring the project into

---

1. Here, Plaintiffs began but did not complete the application process. There has been no formal denial.

compliance with the standards in the ordinance.

David Owens, *Introduction to Zoning,* "Special Use Permits," 55 (1995).

### b. Zoning review prior to issuing a privilege license does not render the scheme a prior restraint or render it properly subject to analysis as such.

In *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), the Supreme Court discussed what constitutes a prior restraint:

> The restraints took a variety of forms, with officials exercising control over different kinds of public places under the authority of particular statutes. All, however, had this in common: they gave public officials the power to deny use of a forum in advance of actual expression.
>
> . . . .
>
> In *Cantwell v. Connecticut,* [310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)] ... a unanimous Court held invalid an act which proscribed the solicitation of money or any valuable thing for "any alleged religious, charitable or philanthropic cause" unless that cause was approved by the secretary of the public welfare council. The elements of the prior restraint were clearly set forth:
>
> > "It will be noted, however, that the Act requires an application to the secretary of the public welfare council of the State; that he is empowered to determine whether the cause is a religious one, and that the issue of a certificate depends upon his affirmative action. If he finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exercise of judgment, and the formation of an opinion." ...
>
> The elements of prior restraint identified in *Cantwell* and other cases were clearly present in the system by which the Chattanooga board regulated the use of its theaters. One seeking to use a theater

was required to apply to the board. The board was empowered to determine whether the applicant should be granted permission—in effect, a license or permit—on the basis of its review of the content of the proposed production. Approval of the application depended upon the board's affirmative action. Action was not a matter of routine; instead, it involved the "appraisal of facts, the exercise of judgment, and the formation of an opinion" by the board.

*Id.,* 420 U.S. at 554, 95 S.Ct. at 1244.

> None of the circumstances qualifying as an established exception to the doctrine of prior restraint was present. ... Nor was the rejection of the application based on any regulation of time, place, or manner related to the nature of the facility or applications from other users.

*Id.,* 420 U.S. at 555, 95 S.Ct. at 1245.

Therefore, these are the elements of a prior restraint:

> 1) one seeking access to a forum must apply for its use; 2) the government authority is empowered to determine whether the applicant should be granted permission to speak on the basis of a review of the content of the speech; 3) the approval to speak depends upon the government's affirmative action; and 4) approval is not a matter of routine, but rather the decision to permit or refuse the speech involves "appraisal of facts, the exercise of judgment, and the formation of an opinion."

*Harless v. Darr,* 937 F.Supp. 1351, 1353 (S.D.Ind.1996) (quoting *Southeastern Promotions,* 420 U.S. at 554, 95 S.Ct. at 1244).

In *FW/PBS v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Supreme Court determined that a Dallas licensing scheme for sexually oriented businesses was a prior restraint, although a review of the content of speech was not involved in the determination of whether the applicant should be granted permission to speak and although the licensing scheme involved zoning, such that adult establishments were not banned from Dallas altogether.[2]

---

**2.** Not banning adult establishments altogether was sufficient for analyzing the *Renton* ordinance as a time, place, and manner regulation:

The scheme affected nonobscene movies, adult bookstores, cabarets, nude model studios, and other activities. "Under the ordinance, the city [did] not exercise discretion by passing judgment on the content of any protected speech. Rather, the city review[ed] the general qualifications of each license applicant...." *Id.*, 493 U.S. at 229, 110 S.Ct. at 607.

Thus, under the licensing scheme, the health and fire departments and the city building official had to inspect sexually oriented businesses each year and whenever business ownership changed. The inspection requirement as to sexually oriented businesses was more onerous than with respect to the vast majority of other businesses. Moreover, the ordinance prohibited the issuance of a license to an applicant who had resided with an individual whose license application had been denied or revoked within the preceding twelve months. The ordinance had a civil disability provision, disabling those who had been convicted of certain enumerated crimes as well as those whose spouses had been convicted of the same enumerated crimes.

The Court held that the scheme imposed a prior restraint because sexually oriented businesses could not operate before being inspected.

> "It is settled by a long line of recent decisions of this Court that an ordinance which ... makes the peaceful enjoyment of freedoms contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official— is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms."

*Id.*, 493 U.S. at 226, 110 S.Ct. at 605 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969) (quoting *Staub v. City of Baxley*, 355

U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958))).

Thus, *discretion* rendered the ordinance a prior restraint. This is recognized in Justice White's partial concurrence:

> The Dallas scheme regulates who may operate sexually oriented businesses, including those who sell materials entitled to First Amendment protection; but the ordinance does not regulate content and thus it is unlike the content-based prior restraints that this Court has typically scrutinized very closely. ...

> Licensing schemes subject to First Amendment scrutiny, however, even though purporting to be time, place, and manner restrictions, have been invalidated when undue discretion has been vested in the licensor. Unbridled *discretion with respect to the criteria used in deciding whether or not to grant a license* is deemed to convert an otherwise valid law into an unconstitutional prior restraint.

*Id.*, 493 U.S. at 245–46, 110 S.Ct. at 615 (case citations omitted; emphasis supplied). (By contrast, in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), a censorship board which was determined to be a prior restraint, approved or disapproved every film on the basis of its content and suitability for public viewing.)

■ *FW/PBS* and *Southeastern Promotions* agree that, whether or not the review is based upon content, a prior restraint arises where administrative discretion involves judgment over and beyond applying classifying definitions. Whether or not the review is based upon content, the fourth criterion is necessary and sufficient for prior restraint: where approval is not routine but involves the appraisal of facts, the exercise of judgment, and the formation of an opinion. "Does it pass inspection?" involves discretion of a categorically different sort from "What

---

The *Renton* ordinance, like the one in *American Mini Theatres*, does not ban adult theaters altogether, but merely provides that such theaters may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. The ordinance is therefore properly analyzed as a form of time, place, and manner regulation.

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986).

By comparison, the Dallas scheme in *FW/PBS* incorporated zoning, licensing, and inspections. *FW/PBS*, 493 U.S. at 220–21, 110 S.Ct. at 602.

is it?". The former runs a strong risk of prior restraint. The latter may encounter constitutional objections arising from definitional play in statutory terms but is not, without the fourth criterion, a prior restraint as defined in *Southeastern Promotions* and *FW/PBS*.

The Fourth Circuit Court of Appeals applied *FW/PBS* in *11126 Baltimore v. Prince George's County, Maryland*, 58 F.3d 988 (4th Cir.1995), in deciding whether the County's adult bookstore zoning ordinance imposed an unconstitutional prior restraint on speech. The ordinance in question prohibited adult bookstores from operating anywhere in the County unless they obtain a special exception and adhere to other requirements imposed by the ordinance. To obtain a special exception, adult bookstores were required to file an application. In reviewing the application, a "District Council" for Prince George's County was directed by the ordinance to consider a number of factors having to do with whether the proposed site was suitable for an adult bookstore, and to decide within one hundred fifty days after the complete application was received.

Applying *FW/PBS*, the Court concluded that this zoning ordinance, unlike that in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), was properly analyzed as a prior restraint, that is, in terms of whether the *Freedman* procedural safeguards were met[3], because under this zoning ordinance adult bookstores were prohibited from operating anywhere within the County until permission in the form of a special exception had been granted. *Id.*, 58 F.3d at 995.

[I]t is undoubtedly true that if Prince George's County had structured its zoning ordinance like the one reviewed in *Renton*, no additional analysis of whether the ordinance constituted an unconstitutional prior restraint on protected speech would be required. ... In *Renton*, no such permission was required, with the result that those wishing to engage in protected speech were immediately free to do so anywhere within the city that met the zoning restrictions imposed by the city ordinance.

*Id.* (see discussion of *Renton*, below).

■■■ A zoning ordinance *per se* is not a prior restraint. Nor does taking reasonable steps to gather the necessary information to effect a zoning ordinance which is otherwise a valid time/place/manner restriction render it a prior restraint. *See, e.g., Christy v. Randlett*, 932 F.2d 502 (6th Cir.1991). The *Freedman* requirements apply when additional administrative discretion, over and beyond applying classificatory definitions, renders the zoning ordinance a prior restraint:

Although the County may properly regulate the time, place, and manner of the operation of an adult bookstore through its zoning ordinances, to pass constitutional muster any zoning ordinance imposing a prior restraint on the exercise of protected speech must provide for a determination in a specified and reasonably brief period of time.

*Id.*, 58 F.3d at 998. The Prince George's County ordinance was analyzed as a prior restraint because of its blanket prohibition from operating anywhere in the city without permission in the form of a special use exception granted or denied by the District Council after reviewing a number of factors. *Id.*, 58 F.3d at 992, 995.

In *Chesapeake B & M, Inc. v. Harford County, Md.*, 58 F.3d 1005 (4th Cir.1995), the Court analyzed the Harford County, Maryland, adult bookstore as a prior restraint. The Harford County Licensing Law declared it unlawful to operate an adult bookstore in the County without a license issued by the County Licensing Department. To obtain a license, a prospective store operator was required to complete an application and dis-

---

**3.** The Supreme Court identified in *Freedman* the following three requirements necessary to guarantee that a decision is rendered promptly:

(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained;

(2) expedition judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*Freedman v. Maryland*, 380 U.S. 51, 58–60, 85 S.Ct. 734, 738–40, 13 L.Ed.2d 649 (1965).

close to the Licensing Department certain (in some respects personal) information, submit to a background criminal check, and disclose the criminal history of spouse or roommate as well as employees and major investors. The Licensing Department then requested a Health Department inspection and referred the application to any governmental agencies that could have relevant information. The Licensing Department was authorized to deny a license for a variety of reasons, e.g., failing a health inspection or prior criminal history. The license had to be renewed annually. Once in operation, an adult bookstore could have its license suspended or revoked for any reason for which its license could have been denied at the outset, or for a variety of other reasons, including failure to allow an inspection or criminal convictions by employees. Thus, the Harford County ordinance involved appraisal of facts, exercise of judgment, and formation of opinion, the fourth *Southeastern Promotions* criterion.

■ Guided by *Southeastern Promotions, FW/PBS, 11126 Baltimore,* and *Chesapeake B & M,* the undersigned concludes that Charlotte's privilege license scheme is not a prior restraint because it does not involve appraisal of facts, exercise of judgment, and formation of opinion by administrators whose discretion is not bridled by objective criteria. The Charlotte zoning administrator merely determines what kind of business, by reference to statutory definitions. This is not the sort of "discretion" that renders a zoning ordinance a prior restraint. Neither the zoning administrator nor the issuer of the privilege license has any discretion as to whether the business will be allowed to operate if it is the type of business for which the area is zoned. Charlotte officials do not have discretion beyond applying definitions, with respect to the criteria used in deciding whether or not to grant a license. Charlotte's privilege license scheme stands in marked and relevant contrast to those in Dallas and Maryland, chronicled above, which the courts concluded should be analyzed as prior restraints, and which involved appraisal, judgment, and opinion, not to mention ongoing supervision.

c. **Lack of a time limit within which the zoning administrator must classify the business does not require invalidation of Charlotte's privilege license scheme.**

■ "A prior restraint that fails to place limits on the time within which the decision-maker must issue the license is impermissible." *FW/PBS,* 493 U.S. at 226, 110 S.Ct. at 605. Since the Charlotte privilege license scheme does not involve the sort of discretion that renders it a prior restraint, and is not otherwise properly subject to analysis as a prior restraint, the lack of a stated time limit within which the zoning administrator must perform the mere ministerial routine of classifying the business, which is necessary to effecting the sort of zoning explicitly approved in *Young* and *Renton,* does not require its invalidation on the ground that it transgresses the procedural requirements articulated in *Freedman* and reiterated in *FW/PBS.*

2. **The zoning ordinance.**

a. **Plaintiff does not "lose" its First Amendment rights if Charlotte restricts adult bookstores and theaters to certain geographical zones.**

The Supreme Court has held that statutory classification is not unconstitutional for the reason that it is based on the content of First Amendment-protected communication. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ("[W]e have no doubt that the municipality may control the location of theaters as well as the location of other commercial establishments, either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city. The mere fact that commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances. ... In short, apart from the fact that the ordinances treat adult theaters differently from other theaters and the fact that the classification is predicated on the content of material shown in the respective theaters, the regulation of the place where such films may be exhibited does

not offend the First Amendment." 427 U.S. at 62–63, 96 S.Ct. at 2448–49) *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ("Cities may regulate adult theaters by dispersing them, as in Detroit, or by effectively concentrating them, as in *Renton.*" 475 U.S. at 52, 106 S.Ct. at 931); *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413, 1419 (8th Cir. 1994) ("ILQ is not primarily concerned with its right of free expression, or it would have located Downtown Book and Video in an unrestricted part of the city.").

**b. The Charlotte zoning ordinance does not ban adult establishments altogether, but merely regulates their location. The ordinance is therefore properly analyzed as a time/place/manner regulation acceptable if it is designed to serve a substantial governmental interest and if it does not unreasonably limit alternative avenues of communication. *Renton*, 475 U.S. at 46–7, 106 S.Ct. at 928. The Charlotte zoning ordinance clearly meets these standards.**

The Charlotte zoning ordinance is content-neutral, designed to serve a substantial governmental interest, and allows for reasonable alternative avenues of communication.

As in Detroit, as Justice Powell concluded, Charlotte has not embarked upon an effort to suppress free expression. Charlotte has silenced no message, invoked no censorship, and imposed no limitation upon those who wish to view the movies or read the books. The ordinance is addressed only to the places at which this type of expression may be presented, a restriction that does not interfere with content. There is no significant curtailment of movie showings or book sales, or the opportunity for a message to reach an audience. The ordinance imposes no content limitation on the creators of "adult" movies or the authors of "adult" literature. It does not limit their ability to make them available to whom they desire. It does not restrict in any significant way access to these movies and books by those desiring access. *Young v. American Mini Theatres, Inc.*, 427 U.S. at 78–80, 96 S.Ct. at 2456–57 (Powell, J., concurring).

**(1) The Charlotte zoning ordinance is content-neutral and designed to serve a substantial governmental interest.**

The Charlotte ordinance is consistent with the Supreme Court's definition of "content-neutral" speech regulations, as those that "are justified without reference to the content of the regulated speech." *Renton*, 475 U.S. at 48, 106 S.Ct. at 929 (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). The ordinance is aimed, not at the content of films shown and books sold at adult establishments, but rather at what studies find are the secondary effects of a concentration of such establishments upon the surrounding community. "The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51–2, 106 S.Ct. at 931.

The language of the preamble provides a clear statement of intent. By this ordinance Charlotte seeks to further what is unquestionably a substantial interest in curbing the blighting of neighborhoods and to protect the integrity of schools, churches, and areas where children frequent. *See Finding of Fact 6a above.* "[A] city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *Renton*, 475 U.S. at 50, 106 S.Ct. at 930 (quoting *Young*, 427 U.S. at 71, 96 S.Ct. at 2453). "If [Charlotte] had been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location." *Young*, 427 U.S. at 82 n. 4, 96 S.Ct. at 2458 n. 4.

What evidence the record presents entirely supports the conclusion that the Charlotte ordinance is narrowly tailored to

further this legitimate interest. That is, the ordinance is designed to affect only that category of theaters shown to produce the unwanted secondary effects. *Renton*, 475 U.S. at 52, 106 S.Ct. at 931. *See, Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).[4]

In sum, the evidence before this court points to the same conclusion for the Charlotte ordinance that Justice Powell reached regarding the Detroit ordinance:

> [The] dissent misconceives the issue in this case by insisting that it involves an impermissible time, place, and manner restriction based on the content of expression. It involves nothing of the kind. We have here merely a decision by the city to treat certain movie theaters differently because they have markedly different effects upon their surroundings. . . .

*Young*, 427 U.S. at 82 n. 6, 96 S.Ct. at 2458 n. 6, cited in *Renton*, 475 U.S. at 49–50, 106 S.Ct. at 930.

**(2) The Charlotte zoning ordinance does not unreasonably limit alternative avenues of communication.**

 "To be reasonable, time, place, and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication." *Schad*, 452 U.S. at 75–76, 101 S.Ct. at 2186. "Cities may regulate adult theaters by dispersing them, as in Detroit, or by effectively concentrating them, as in Renton." *Renton*, 475 U.S. at 54, 106 S.Ct. at 932. Charlotte has clearly met the "reasonable alternative avenues of communication" standard. "The Supreme Court has made clear that zoning regulations that ban activities in some parts of a community but not others do not limit unreasonably other alternative avenues of communication." *Marty's Adult World v. Town of Enfield, Conn.*, 20 F.3d 512, 516 (2d Cir.1994). The Charlotte ordinance permits adult establishments in B–2 (business), UMUD (uptown mixed use), and I–1 and I–2 (industrial) zoning districts. The spacing requirements are consistent with those upheld in *Renton* and *Young*.[5] Plaintiffs do not seriously challenge the reasonableness of alternatives. The undersigned concludes that Charlotte has provided reasonable alternative avenues of communication.

**c. The Charlotte zoning ordinance is not impermissibly vague.**

Plaintiffs argue that the Charlotte ordinance is unconstitutionally vague. More particularly, Plaintiffs challenge the use of "[has as] one of its principal business purposes" or

4. In *Grayned*, the Supreme Court stated:

> The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable. . . . The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest.

408 U.S. at 117, 92 S.Ct. at 2303–04 (citations omitted), quoted in *Schad*, 452 U.S. at 75, 101 S.Ct. at 2186.

> *Schad* further requires that "[t]o be reasonable, time, place, and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication." 452 U.S. at 75–76, 101 S.Ct. at 2186.

The *instant record* provides a statement of intent to curb secondary effects of adult establishments, and references studies supporting the drafting of an ordinance restricting adult establishments to certain zones in the city as a means of curbing their secondary effects. Although one would suppose it to be the case, the record does not bear the weight of a determinate conclusion as to whether adult establishments are basically incompatible with the normal activity of the particular places from which they are excluded. The record would, presumably, be more fully developed at later stages of the litigation. Plaintiffs do not seriously challenge the tailoring of this ordinance. On this record, the undersigned concludes that tailoring should not in any event be a basis for a preliminary injunction.

5. [T]he resolution of this case is largely dictated by our decision in *Young v. American Mini Theatres, Inc., supra*. There, . . ., we held that the city of Detroit's zoning ordinance, which prohibited locating an adult theater within 1,000 feet of any two other "regulated uses" or within 500 feet of any residential zone, did not violate the First and Fourteenth Amendments. *Renton*, 475 U.S. at 46, 106 S.Ct. at 928.

"[having] a substantial or significant portion of its stock or trade" in reference to the portion of stock in trade which would render an establishment adult. Plaintiffs also challenge the phrase, "distinguished or characterized by their emphasis on matter depicting, describing, or relating to." *See Finding of Fact 6b.* Plaintiffs contend that they cannot know how many sexually explicit materials they may carry to avoid the "adult" classification and its consequence of not being able to operate in a space not zoned for adult businesses.

**(1) Plaintiffs lack standing to challenge the ordinance for vagueness.**

■ In *Young v. American Mini Theatres, Inc., supra,* respondents argued, in analogous fashion to the instant case, that they could not determine how much of the described activity may be permissible before the exhibition was "characterized by an emphasis" on such matter. The Supreme Court determined that they did not have standing to raise this contention:

> We find it unnecessary to consider the validity of either of these arguments in the abstract. For even if there may be some uncertainty about the effect of the ordinances on other litigants, they are unquestionably applicable to these respondents. The record indicates that both theaters propose to offer adult fare on a regular basis. Neither respondent has alleged any basis for claiming or anticipating any waiver of the restriction as applied to its theater. It is clear, therefore, that any element of vagueness in these ordinances has not affected these respondents. To the extent that their challenge is predicated on inadequate notice resulting in a denial of procedural due process under the Fourteenth Amendment, it must be rejected.
> . . .

*Id.,* 427 U.S. at 58–59, 96 S.Ct. at 2446–47.

The Court further states that persons whose own speech is unprotected have standing to challenge the constitutionality of a statute purporting to prohibit protected or arguably protected speech if the statute's deterrent effect is both real and substantial and if the statute is not readily subject to a narrowing construction by the state courts. The majority agreed that these concerns are not present when sexually explicit materials are at issue:

> Since there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance, and since the limited amount of uncertainty in the ordinances is easily susceptible of a narrowing construction, we think this is an inappropriate case in which to adjudicate the hypothetical claims of persons not before the Court.

*Id.,* 427 U.S. at 61, 96 S.Ct. at 2448. *See, Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821, 833 (4th Cir.1979).

Likewise, the instant Plaintiffs do not have standing to challenge the constitutionality of the ordinance on grounds of vagueness. On May 16, 1997, Plaintiffs told Defendant Barley that their business at 5920 South Boulevard was ready to open that afternoon. Plaintiff states to the Court that there have been no material changes to its premises or inventory since that date. Court-ordered expedited discovery demonstrated that most if not all of the "novelty items and devices" stocked or displayed for sale on the premises were clearly "sexually oriented devices" in nature. *N.C.Gen.Stat.* § 14–202–10(9); *Zoning Ordinance.*

Moreover, Plaintiffs acknowledge an inventory of 2,000 assorted video tapes of movies and sporting events, 500 paperback books and comic magazines, and 5,000 novelty items. Section 12.522 of the Charlotte Zoning Ordinance defines an "adult bookstore" to include a store which either has as one of its principal purposes or which has a substantial or significant portion of its stock in trade for sale or rental as either publications of certain specified types and/or "sexually oriented devices" as defined in N.C.Gen.Stat. § 14–202.10(9). By this definition, Plaintiffs' proposed business beyond cavil falls within the definition of "adult bookstore" provided by the ordinance.

Finally, by analogy to the reasoning in *Young,* discussed above, and on the record

before court, the undersigned concludes that the alleged deterrent effect of the ordinance is neither real nor substantial, and that the ordinance is readily subject to a narrowing construction by State courts. Therefore, Plaintiffs lack standing as third parties to challenge the ordinance on grounds of vagueness.

(2) **Even were Plaintiffs granted standing, the Charlotte ordinance would likely withstand their vagueness challenge.**

▆▆▆ Application of relevant principles in *Young* and *Hart, supra,* leads the undersigned to conclude that the Charlotte ordinance would withstand this vagueness challenge. As with Detroit's ordinances, so with Charlotte's:

> [T]he only vagueness in the ordinances relates to the amount of sexually explicit activity that may be portrayed before the material can be said to be "characterized by an emphasis" on such matter. For most films the question will be readily answerable; to the extent that an area of doubt exists, we see no reason why the ordinances are not "readily subject to a narrowing construction by the state courts."

*Young,* 427 U.S. at 61, 96 S.Ct. at 2448.

Applying this reasoning to the challenged phrases, construing them in light of this detailed ordinance as a whole, and in light of cases either construing those very phrases or affording principles for so doing, the undersigned concludes that the challenged definitions and phrases are not devoid of meaningful legislative standards and are reasonably specific and precise, "bearing in mind that unavoidable imprecision is not fatal and celestial precision is not necessary." *Hart,* 612 F.2d at 833. Further, given the relatively weak nature of Plaintiffs' First Amendment interest, the First Amendment is not offended by Charlotte's refusal to provide even more precise or even bright line clarifications as to when an establishment will be characterized as "adult." *Compare ILQ,* 25 F.3d at 1419 ("Given the City's properly substantiated interest in these zoning regulations, we see no reason why ILQ should not be subject

to the same tensions and uncertainties that zoning regulations typically impose upon other legitimate enterprises.") As stated in *Young:*

> The fact that the First Amendment protects some, though not necessarily all, of that material from total suppression does not warrant the further conclusion that an exhibitor's doubts as to whether a borderline film may be shown in his theater, as well as in theaters licensed for adult presentations, involves the kind of threat to the free market in ideas and expression that justifies the exceptional approach to constitutional adjudication recognized in cases like *Dombrowski v. Pfister, [*380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)*]....*
>
> The application of the ordinances to respondents is plain; even if there is some area of uncertainty about their application in other situations, we agree ... that respondents' due process argument must be rejected.

*Id.,* 427 U.S. at 61, 96 S.Ct. at 2448.

Moreover, cases have upheld language identical or similar to the challenged language in the Charlotte ordinance. *See, e.g., FW/PBS, supra; Young, supra; Hart, supra.* Plaintiffs rely upon *Ellwest Stereo Theater, Inc. v. Boner,* 718 F.Supp. 1553 (M.D.Tenn. July 14, 1989) for their argument that "substantial or significant" is impermissibly vague. In *Ellwest* the Court found this language impermissibly vague, relying in large measure upon testimony by a designated spokesperson for the Health Department to the effect that under this language he could not discern which businesses he was entitled to regulate. *Id.* at 1581 ("Clearly, if the regulating authority cannot determine the establishments which are subject to its authority, the establishments themselves cannot be expected to determine whether they need to be licensed or not."). Evidence of this sort is not present in the instant record. To the contrary, evidence in the record points to the zoning decisions being made by the administrator, who must apply the definitions. As against the Court's reasoning in *Ellwest,* the undersigned finds the principles of *Young,* above, persuasive. The

"substantial or significant" phrase was used in the *Young* ordinance, 427 U.S. at 53 n. 5, 96 S.Ct. at 2444 n. 5. Moreover, as discussed in *ILQ*, "[t]he limiting term, 'substantial portion' of a bookstore's merchandise, which ILQ characterizes as impermissibly vague, appears frequently in the United States Code," and is thus not devoid of meaningful legislative standards. 25 F.3d at 1419.

For these reasons, the undersigned concludes that Plaintiffs are not likely to succeed in their attacks premised upon vagueness.

### d. The Charlotte zoning ordinance would likely withstand Plaintiff's overbreadth challenge.

■ "A clear and precise enactment may nevertheless be "overbroad" if in its reach it prohibits constitutionally protected conduct." *Grayned*, 408 U.S. at 114, 92 S.Ct. at 2302. Plaintiffs contend that "substantial or significant" is overbroad because it is insufficiently determinate as to how much sexually explicit material qualifies for the "adult" classification. Plaintiffs further argue that § 12.522 allows zoning officials to classify any business as "adult" because the business restricts access to persons under sixteen years of age.

For reasons discussed above as to vagueness, the undersigned concludes that Plaintiffs lack standing to challenge the Charlotte ordinance on grounds of overbreadth. *Young*, 427 U.S. at 59–61 and n. 17, 96 S.Ct. at 2446–48 and n. 17.

Regardless of standing, the undersigned concludes that Plaintiffs are not likely to succeed on the basis of overbreadth. As to the argument based upon restricted access, Plaintiffs fail to read this portion of the ordinance in *pari materia* with the remainder. The ordinance requires consideration of this factor "in addition to all other information available," and no administrative or judicial interpretation has construed it as necessary and sufficient for an establishment to be categorized as "adult." The phrase is clearly susceptible to a limiting construction by reference to the ordinance taken as a whole.

■ The overbreadth argument based upon the phrase, "substantial or significant," is unlikely to succeed. On the record before the Court, and for reasons discussed as to vagueness, the Charlotte ordinance does not create a "significant deterrent effect" that would justify invocation of the overbreadth doctrine. *Young*, 427 U.S. at 59–61, 96 S.Ct. at 2446–48; *Renton*, 475 U.S. at 55 n. 4, 106 S.Ct. at 933 n. 4.

### Conclusions of Law as to the *Blackwelder* Criteria

### 1. Likelihood of irreparable harm to Plaintiff if the preliminary injunction is denied.

Plaintiff's claim to irreparable injury rests upon "loss" of free speech rights.[6] Having concluded that Charlotte's privilege license scheme and zoning ordinance do not occasion the loss of free speech rights, the undersigned further concludes that Plaintiff is not likely to suffer irreparable harm from failure to enjoin their enforcement or failure to order the issuance of a privilege license, which would likely in any event be subject to immediate revocation because of the content of the inventory as revealed in discovery. Plaintiff is at unrestricted liberty to sell its materials at appropriately zoned areas within Charlotte.

### 2. Likelihood of harm to Defendants if the requested relief is granted.

Plaintiff asks the Court to enjoin enforcement of any of the provisions of § 12.522 until the Court decides as to declaratory relief and to order the issuance of a privilege license to Plaintiff. The likelihood of harm to Defendants should such an injunction is-

---

6. In *Manning v. Hunt*, by contrast, Plaintiffs' case for irreparable injury involved extensive consequential evidence. The Court noted that "[t]he District Court correctly emphasized that its decision regarding irreparable injury to the plaintiff must not be based on the ultimate issue of the constitutionality of the statute in question and recognized that the showing necessary to demonstrate irreparable harm is less strict in cases involving the constitutional challenge to a statute than in cases in which there is the possibility of future monetary damages." 119 F.3d at 264. In the instant case, the irreparable injury urged by Plaintiff is purely and simply the loss of free speech rights.

sue is in proportion to the likelihood of the dangers articulated in the preamble ·of the adult zoning ordinance (lowered property values, increased crime rates, blighting of neighborhoods, etc.). Moreover, enforcement being enjoined, and having inventory, Plaintiff could operate an adult bookstore as did its predecessor and landlord, with whatever secondary effects that might entail. For Charlotte to establish an illegal ·use, at these premises or elsewhere, would require the lengthy enforcement process outlined in Findings of Fact, with an appeal to the Zoning Board of Adjustment and State Superior Court effectively staying all proceedings in furtherance of enforcement.

**3. Balancing the likelihood of harm to Plaintiff against the likelihood of harm to Defendant if the preliminary injunction is granted.**

The record does not support a conclusion as to the extent of the negative secondary effects predicted by the studies, should enforcement of the ordinance be enjoined. Critical to the weighing process here, though, is the simple fact that Plaintiff faces no immediate threat of irreparable harm. Under the circumstances, the undersigned cannot conclude that the balance of hardship favors Plaintiff.

If the balance tipped decidedly in favor of Plaintiff, it would suffice that Plaintiff show that it has litigable issues ("serious, substantial, difficult and doubtful"). However, a *stronger showing is required if*, as here, the balance tips away from Plaintiff. A plaintiff under such circumstances must have a very clear and strong case, such that it is likely to succeed at the ultimate trial on the merits. Such is the standard to which this Plaintiff should be held in showing likelihood of success on the merits.

**4. Likelihood that Plaintiff will succeed on the merits.**

For reasons discussed in Conclusions of Law, above, the undersigned concludes that Plaintiff has not shown a likelihood of success of the ultimate trial on the merits.

**5. The public interest.**

The general desideratum is whether and to what extent the public interest lies in "preserving the status quo *ante litem* until the merits of a serious controversy can be fully considered by a trial court." *Blackwelder*, 550 F.2d at 197.

The public has a primary interest in vindication of the First Amendment. However, Plaintiff has not shown a constitutionally impermissible abridgement of First Amendment liberties or intrusion upon their exercise. That being the case, preserving enforcement of the zoning ordinance and privilege license scheme is in the public interest, tending to mitigate or eliminate deleterious secondary effects.

### Conclusion

Having weighed the *Blackwelder* factors, for the reasons stated above, the undersigned concludes that a preliminary injunction should not issue to enjoin enforcement of the privilege license scheme or zoning ordinance, either generally or in Plaintiff's instance.